UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| DAVID FAYSOM, | ) | |
|---|---|---|
| | ) | |
| **Plaintiff,** | ) | |
| | ) | No. 04 C 8312 |
| v. | ) | |
| | ) | |
| EVARISTO AGUINALDO, JR., M.D., | ) | Magistrate Judge Susan E. Cox |
| PARTHASARATHI GHOSH, M.D., | ) | |
| ANDREW H. TILDEN, M.D., | ) | |
| KEVIN S. SMITH, M.D., | ) | |
| PAULETTE TIMM, R.N., | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

In this civil rights suit, plaintiff David L. Faysom ("Faysom") brings an action under 42 U.S.C. § 1983 against defendants, Andrew Tilden, M.D., Evarista Aguinaldo, M.D., Kevin Smith, M.D., Parthasarathi Ghosh, M.D., and Paulette Timm, R.N. ("Timm"), a nurse at Stateville Correctional Center ("Stateville"). Faysom, a prisoner residing at Stateville, specifically alleges that each defendant violated the Eighth Amendment in acting with deliberate indifference when they failed to immediately act on a diagnosis of symptoms that are often linked to cancerous tumors and refused to administer available therapy and medications after he underwent brain tumor surgery. Currently before the court is the defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56(b). For the reasons stated herein, the motion is granted with respect to defendants Dr. Ghosh and Timm, and denied as to Drs. Tilden, Aguinaldo and Smith [dkt 215].

**I. FACTS**

Unless otherwise noted, the following facts are undisputed and taken from the Plaintiff's

1

Response to Defendants' Local Rule 56.1 Statement of Facts.[1] While many of the defendants' facts involve medical diagnoses and observations in Faysom's records, Faysom was unable to verify some of his prior physical complaints due to the illegibility of certain doctors' entries.

**A. Dr. Aguinaldo, Dr. Tilden and Dr. Smith**

Faysom is an inmate currently residing within the Illinois Department of Corrections and all of his claims arise from his incarceration at Stateville.[2] Beginning in February 2001, Faysom began experiencing blurred vision, headaches, memory loss and balance problems.[3] These problems persisted and on July 3, 2002, Dr. Aguinaldo, a staff physician at Stateville, examined Faysom after he complained of headaches and blurred vision.[4] He referred Faysom to an optometrist based on a potential abnormality found in his eye examination.[5] On July 16, 2002, Dr. Aguinaldo again examined Faysom and confirmed his referral to the optometry clinic.[6]

The next day, Stateville's staff optometrist, Thomas Bialecke, O.D., examined Faysom. He found blurred and raised disc margins, and disc hemorrhages.[7] Dr. Bialecke noted that these symptoms could be indicative of papilledema or papillitis.[8] Papilledema is defined as both edema and inflammation of the optic nerve at its point of entrance into the retina.[9] It is a sign of increased intracranial pressure on the optic nerve, often a result of expanding brain tumors, and may result in

---

[1] Citations to the record are as follows: Plaintiff's Response to Defendant's Local Rule 56.1(a) Statement of Material Facts is cited as PR ¶ ; Plaintiff's Exhibits in Support of Response to Defendant's Statement of Material Facts are PR Ex. __; Plaintiff's Statement of Additional Material Facts is cited as PSOF ¶ ; Plaintiff's Exhibits in Support of Statement of Additional Material Facts are PSOF Ex. __ ; Defendants' Exhibits in Support of Motion for Summary Judgment are cited at Def. Ex. __ ; and Plaintiff's Exhibits in Support of Response to Defendants' Motions for Summary Judgment are cited as Pl. Ex. __.
[2] PR ¶ 2.
[3] Faysom Dep. 204: 2-8, Dec. 15, 2006, PSOF Ex. 2.
[4] PR ¶ 9.
[5] PR ¶ 10.
[6] Ramsey Dep. 37: 6-9, May 15, 2008, PR Ex. H.
[7] PR ¶ 13.
[8] Bialecke Dep. 32-33: 22-3, Mar. 3, 2007, PSOF Ex. 4.
[9] Donald Venes, *Taber's Cyclopedic Medical Dictionary* 1584 (20th ed. 2005).

rapid blindness if not relieved.[10] Papillitis is similar to papilledema but is only a sign of inflammation of the optic nerve.[11] Due to this finding, Dr. Bialecke then referred Faysom to the staff ophthalmologist, Dr. James Bizzell, M.D.[12] On July 31, 2002, prior to meeting with Dr. Bizzell, Dr. Aguinaldo again examined Faysom.[13] Dr. Aguinaldo may have ordered a lab test after finding abnormal urinalysis results but this action is disputed since the legibility of Faysom's records are poor.[14]

One month later, on August 30, 2002, Faysom eventually met with Dr. Bizzell and underwent a funduscopic examination of his eyes.[15] A funduscopy allows physicians to observe the "progression or resolution of certain local, systemic, and neurologic diseases."[16] "The optic nerve, blood vessels, and retina are inspected" in such an exam and may reveal "papilledema, optic atrophy, vascular disease, retinitis, and other disorders."[17] Dr. Bizzell only saw Dr. Bialecke's referral but not his actual report identifying the possibility of papilledema.[18] When asked if he had made any efforts to find the results of Dr. Bialecke's examination, Dr. Bizzell testified that he probably asked his nurse to request the report from the medical records department and that she would have told him that it was unavailable, as was the case with many medical records at Stateville.[19] Dr. Bizzell's notes from his examination revealed none of the abnormalities that Dr. Bialecke identified one month earlier.[20] Dr.

---

[10] Venes, *supra* note 9, at 1584.
[11] Bizzell Dep. 70: 5-6, May 24, 2007, PSOF Ex. 7.
[12] PR ¶ 13.
[13] PR ¶ 14
[14] *Id*.
[15] PR ¶ 15.
[16] *The Merck Manual of Diagnosis and Therapy* 1455 (Mark H. Beers, M.D., & Robert Berkow, M.D. eds., 17th ed. 1999) (1899).
[17] *Id*.
[18] Bizzell Dep. 43: 10-12, PSOF Ex. 7.
[19] *Id.* at 43-44:17-8.
[20] *Id.* at 64: 17-20.

Bizzell diagnosed Faysom with migraine headaches and prescribed a regimen of decreased caffeine intake.[21] Faysom and Dr. Bizzell met again on October 23, 2002, at which time Dr. Bizzell found the reduction in caffeine helpful and noted "fundis O.K."[22] Since migraine drugs may react adversely with other medications, Dr. Bizzell wanted a staff physician to see Faysom and prescribe the correct migraine medication.[23] He proceeded to make a copy of his notes from that day and personally hand it to Dr. Tilden, an internal medicine physician at Stateville, who was seeing patients in the emergency room that day.[24] Dr. Bizelle was unsure whether Dr. Tilden actually saw Faysom that day or prescribed any medication.[25]

A week later, Dr. Tilden performed an initial chart review of Faysom's medical records.[26] The record fails to elaborate on exactly which records or charts Dr. Tilden reviewed. Dr. Tilden saw Faysom two days later for complaints of severe headaches and performed a limited examination of his eyes, not a funduscopic exam.[27] He ordered several tests unrelated to Faysom's headaches, prescribed Motrin and multi-vitamins, and referred Faysom back to Dr. Bialecke.[28] The record fails to reflect whether Faysom was actually sent to the optometry clinic. On January 16, 2003, Faysom was again examined by Dr. Aguinaldo after he complained of pressure behind his eyes, blurred vision, and temporary blindness that morning.[29] The record is unclear whether Dr. Aguinaldo consulted any of Faysom's medical records other than the medical technician's note alerting him of

---

[21] PR ¶ 15.
[22] PR ¶ 16.
[23] Bizzell Dep. 85: 3-24, PSOF Ex. 7.
[24] *Id*. at 95: 8-12.
[25] *Id.* at 95: 20-23.
[26] PR Ex. C, October 30, 2002. The medical records contained in Plaintiff's Response to Defendant's Local Rule 56.1(a) Statement of Material Facts have no page numbers and will necessarily be identified by their dates.
[27] PR ¶ 21.
[28] PR Ex. C, November 1, 2002.
[29] PR ¶ 18.

Faysom's complaints from the morning.[30] While it appears that Dr. Aguinaldo referred Faysom for a psychological examination on that day, the plaintiff disputes this because the copies of his medical records lack sufficient clarity to unequivocally confirm the referral.[31] Faysom again saw Dr. Tilden on January 19, 2003,[32] and Dr. Tilden found Faysom's pupils to be equal, round and reactive to light.*[33]* He did not perform a funduscopic exam.[34] Dr. Tilden noted the possibility of hypoglycemia, ordered tests for the condition and referred Faysom to the optometry clinic again.[35] On January 27, 2003, Faysom was admitted to an emergency room after passing out and experiencing total blackouts in vision.[36] Dr. Tilden happened to be the emergency room doctor at the time and examined plaintiff, referring him to the ophthalmology clinic for the fourth time.[37]

The Stateville medical director at the time, Dr. Smith, was the next physician to examine Faysom. Although Dr. Smith reviewed Faysom's medical records and twice signed off on consult forms from Dr. Bizzell,[38] January 31, 2003 was the first day that he personally examined Faysom.[39] Faysom had complained of nearly twelve episodes of blindness per day and headaches lasting nearly half an hour.[40] Dr. Bizzell had examined Faysom earlier that same day[41] and recommended that Dr. Smith personally see Faysom and arrange for an MRI to evaluate the risk of papilledema, since the results of his funduscopic exam were unusual.[42] Dr. Smith's funduscopic examination of Faysom

---

[30] Aguinaldo Dep. 95: 5, Jan. 19, 2007, PSOF Ex. 5.
[31] PR ¶ 18.
[32] PR ¶ 23.
[33] PR Ex. C, January 19, 2003.
[34] *Id*.
[35] *Id*.
[36] Ramsey Dep. 84: 13-18, PR Ex. H.
[37] *Id*. at 84-85: 18-12.
[38] PR ¶ 27 and 29.
[39] PR ¶ 31.
[40] *Id*.
[41] *Id*.
[42] PR Ex. C, January 31, 2003 (Dr. Bizzell's consultation report submitted to Dr. Smith); *See also* Smith Dep. 139-40: 24-9; 144: 1-4; 146: 18-19, Jan. 17, 2007, PSOF Ex. 6.

5

revealed no changes consistent with papilledema.[43] The record fails to identify what records Dr. Smith consulted before examining Faysom and Dr. Smith was unsure whether he ordered the diagnostic tests after this initial examination or at some later date.[44] Though there are no entries in the record of visits with Dr. Smith on February 4, 6, 7, and 10, Dr. Smith contends that he again saw Faysom on these dates for similar complaints of headaches and vision problems.[45] On February 14, 2003, Faysom was transferred to the University of Illinois at Chicago Hospital ("UIC") to have an MRI to identify the cause of his potential papilledema.[46] The MRI revealed a large midline shift tumor, measuring three to four inches in diameter.[47] Dr. Bizzell explained that there are numerous causes of papilledema but Faysom's tumor was probably the underlying cause of his papilledema.[48] Faysom remained at UIC while he underwent craniotomies to remove his brain tumor on March 20 and April 4, 2003.[49] A craniotomy is an incision through the cranium to gain access to the brain during neurosurgical procedures.[50] The first craniotomy, on March 20, was performed to address the tumor that had been discovered a month earlier.[51] Faysom underwent his second craniotomy to relieve an infected abscess and remove a partially absorbed hemostatic agent.[52]

---

[43]Smith Dep. 142: 1-2, PSOF Ex. 6.
[44]*Id.* at 144: 8-25.
[45]*See* PR ¶ 33-36.
[46]PR Ex. C, February 14, 2003.
[47]*Id. See also* Bizzell Dep. 91: 13-14, PSOF Ex. 7.
[48]Bizzell Dep. 55: 7-18, PSOF Ex. 7.
[49]PR ¶ 39-40.
[50] Venes, *supra* note 9, at 498.
[51]PR ¶ 39.
[52]PR ¶ 40.

**B. Dr. Ghosh and Nurse Timm**

Upon Faysom's return to Stateville's infirmary, the new medical director, Dr. Ghosh, examined Faysom on seven occasions from May 15 to June 3, 2003.[53] On June 3, Faysom showed signs of swelling on the side of his head with some tenderness. Concerned that an abscess may have formed at the site of his craniotomy, Dr. Ghosh sent Faysom to UIC Hospital's Department of Neurosurgery.[54] Surgeons inserted a shunt to drain the excess fluid from Faysom's skull.[55] After several days, Faysom returned to Stateville's infirmary where Dr. Ghosh examined Faysom seventeen times over the next ten days.[56]

Dr. Ghosh monitored Faysom throughout the summer of 2003, occasionally sending him to UIC for additional procedures. On a visit to UIC in December 2003, Troy Close, M.D., recommended low vision rehabilitative therapy and a new eyeglasses prescription.[57] Dr. Ghosh elected not to send Faysom to the UIC ophthalmology clinic since Faysom's visual pathways were irreparably damaged and Stateville's own ophthalmologist continued to care for Faysom.[58] Timm checked on Faysom and gave him his medication on numerous occasions between March 23, 2003 and April 17, 2004.[59]

**C. Procedural History**

On January 13, 2004, Faysom began the formal grievance process with Stateville officials concerning his medical treatment by prison officials.[60] Over two years later, on April 20, 2006, the Administrative Review Board and the Director of Illinois Department of Corrections notified Faysom

---

[53] PR ¶ 41-47.
[54] PR ¶ 47.
[55] PR ¶ 48.
[56] PR ¶ 49.
[57] Close Dep. 53: 7-9, June 8, 2007, PSOF Ex. 10.
[58] Ghosh Dep. 156-57: 21-1, March 6, 2007, PSOF Ex. 11.
[59] PR ¶ 67.
[60] Pl.'s Fourth Amend. Compl. Ex. A.

that his grievances had been denied.[61] On May 3, 2007, Faysom filed his fourth and final amended complaint, alleging in two counts that each defendant violated his constitutional rights in acting with deliberate indifference to his medical condition [dkt 148]. The matter is currently before this court on defendants' motion for summary judgment.

## II. Legal Standard

Summary judgment is appropriate when the record, viewed in the light most favorable to the non-moving party, reveals that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.[62] To prevail on a motion for summary judgment, then, a party must present evidence that demonstrates the absence of a genuine issue of material fact.[63] A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[64] The party seeking summary judgment must identify the portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes shows an absence of a genuine issue of material fact.[65] The evidence presented by the non-movant is to be believed and all justifiable inferences are to be drawn in his or her favor.[66]

## III. Discussion

Faysom's two count complaint divides the defendants into two groups but claims that each defendant acted with deliberate indifference, violating his Eighth Amendment rights. The first group of physicians, Drs. Aguinaldo, Tilden and Smith, were largely responsible for Faysom's care prior

---

[61] Pl.'s Fourth Amend. Compl. Ex. B.
[62] Fed. R. Civ. P. 56(c).
[63] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).
[64] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).
[65] *See* Fed. R. Civ. P. 56(c); *see also Celotex Corp.*, 477 U.S. at 324.
[66] *Anderson*, 477 U.S. at 255.

8

to the discovery of his brain tumor and his resulting craniotomies. Upon his return to Stateville, Dr. Ghosh and Nurse Timm directed his care and monitored his surgical recovery. The Court will, therefore, address Faysom's claims with respect to each doctor in that order.

In this case, Faysom's successful section 1983 claim must show that the defendant prison officials violated the Eighth Amendment's prohibition of cruel and unusual punishment and the "unnecessary and wanton infliction of pain" in displaying "deliberate indifference to serious medical needs of [the] prisoner."[67] Deliberate indifference claims must satisfy both an objective and a subjective element.[68] A claim of deliberate indifference in the context of medical treatment requires a medical condition that is "objectively sufficiently serious."[69] A condition is sufficiently serious when a doctor diagnoses it as "mandating treatment" or it is "so obvious that even a lay person would perceive the need for a doctor's attention."[70] The subjective element of deliberate indifference requires a sufficiently culpable state of mind.[71] A doctor does not need to intend or desire for the harm to transpire, it need only be shown that the doctor knew of the substantial risk of harm to the inmate and disregarded it.[72] In other words, the doctor must recklessly disregard the risk to the inmate's health and safety.[73] Negligent care or even disagreements with another doctor's medical judgment do not rise to the level of deliberate indifference.[74] Additionally, "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was

---

[67]*Estelle v. Gamble*, 429 U.S. 97, 104 (1976).
[68]*Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005).
[69]*Walker v. Benjamin*, 293 F.3d 1030, 1037 (7th Cir. 2002) (citing *Gutierrez v. Peters*, 111 F.3d 1364, 1369 (7th Cir. 1997).
[70]*Edwards v. Snyder*, 478 F.3d 827, 830-31 (7th Cir. 2007) (quoting *Greeno*, 414 F.3d at 653).
[71]*Farmer v. Brennan*, 511 U.S. 825, 834 (1994).
[72]*Walker*, 293 F.3d at 1037.
[73]*Farmer,* 511 U.S. at 836.
[74]*Estelle*, 429 U.S. at 107.

9

obvious."[75]

**A. Drs. Aguinaldo, Tilden and Smith**

Drs. Aguinaldo, Tilden and Smith do not contest that Faysom suffered from an objectively serious medical condition. They agree that Faysom's brain tumor was a serious condition. Therefore, the objective prong of the deliberate indifference analysis is satisfied. But they do contend that they never possessed the subjective knowledge of Faysom's risk of a brain tumor and, thus, could not have recklessly disregarded that risk. First, they argue that the tumor was not so obvious that a lay person could recognize it or see the immediate need for treatment. Second, regardless of what level of care they provided Faysom, they argue that their examinations and reviews of Faysom's records did not reveal the potential presence of papilledema, as was noted in Dr. Bialecke's report, which would have mandated further treatment. Nor did their own care of Faysom lead them to diagnose or suspect that Fayom was at risk of a brain tumor and, consequently, they argue that they could not have acquired the subjective knowledge necessary for deliberate indifference.

Dr. Aguinaldo cites to *Duckworth v. Ahmad* to support his argument that even though he did not order an MRI to rule out tumors as the potential cause of Faysom's symptoms, his actions did not qualify as deliberate indifference.[76] In *Duckworth*, both defendant physicians failed to order a cystoscopy after finding the prisoner suffered from blood in his urine.[77] One of the physicians believed that the prisoner was seeing a separate urologist and neglected to conduct a cystoscopy[78] while the other physician tested for non-cancerous conditions he thought were causing the

---

[75]*Farmer*, 511 U.S. at 842.
[76]*See* 532 F.3d 675 (7th Cir. 2008).
[77]*Duckworth*, 532 F.3d at 677-78.
[78]*Id.* at 677.

10

symptoms, including bladder stones and infections.[79] The *Duckworth* court concluded that neither doctor knew of the risk nor provided care that was "so far afield as to allow a jury to infer deliberate indifference"[80] and, thus, affirmed the grant of summary judgment.[81]

*Duckworth* can be distinguished because the prisoner in that case failed to visit the recommended urologist. Here, Aguinaldo's referral to a specialist resulted in an actual examination that revealed the possible risk of papillitis and papilledema. The doctor in *Duckworth* could not possibly have had knowledge of an examination that never existed, but Faysom's doctors may have had the opportunity to see Dr. Bialecke's report and become aware of his risk of papilledema. Because that fact question exists here, *Duckworth* does not warrant the grant of summary judgment to Drs. Aguinaldo, Tilden and Smith.

Dr. Tilden then argues that differences in opinion concerning which medical examinations should be performed do not rise to the level of deliberate indifference. Dr. Tilden cites to *Estelle v. Gamble* where the United States Supreme Court held that the decision not to order an X-ray in diagnosing and treating a prisoner was an exercise of medical judgment and would be, at most, medical malpractice.[82] The Court noted that an X-ray or other tests may have revealed the greater severity of the prisoner's injury, which had originally been diagnosed as a back sprain, but the physicians opted to treat the prisoner with "bed rest, muscle relaxants and pain relievers" as an X-ray was not a medical necessity at the time.[83]

*Estelle* is also distinguishable because Dr. Bialecke's report identified a risk of papilledema,

---

[79] *Id*. at 680.
[80] *Id.* (citing *Edwards v. Snyder*, 478 F.3d 827, 830-31 (7th Cir. 2007)).
[81] *Id*. at 682.
[82] 429 U.S. 97, 107 (1976).
[83] *Id*.

a more severe risk than an injury such as a back sprain. While a back sprain can be treated with rest and further monitoring, knowledge of the risk of papilledema requires an immediate MRI and workup to eliminate the chance that the swelling was caused by a tumor, and to stave off any greater nerve damage and vision loss.[84] Though all three doctors claim to have not seen the report in the medical record, because the report indeed was in the medical record at the time this case was filed, a fact question remains as to what medical treatment should have followed. Furthermore, *Estelle* is in contrast with this case because it deals with a much less serious injury than the injury presented here.

Lastly, Dr. Smith argues that he was not deliberately indifferent because he also did not see Dr. Bialecke's report while overseeing consultant's recommendations as the prison's medical director, nor did he see the report in treating Faysom on January 31, 2003. Dr. Smith further proposes that this Court follow *Steele v. Choi* and hold that when a number of doctors make the same errors and misdiagnose an illness, the illness cannot be deemed obvious.[85] He further asserts that absent a finding of the physician's actual knowledge of the risk, the knowledge cannot be imputed from the obvious nature of the risk when other doctors also fail to conclude or misdiagnose the medical problem.[86] In *Steele*, two sets of doctors and the defendant doctor all concluded that the prisoner was suffering from symptoms of a drug overdose and not a brain hemorrhage.[87] The *Steele* court held that the evidence presented was not strong enough to raise an inference that the defendant doctor was aware of the risks to the prisoner and, thus, the doctor was not deliberately indifferent.[88]

---

[84]*See* Tureff Dep. 7: 17-22, May 27, 2008, PSOF Ex. 9; *see* Ramsey Dep. 125: 9-12,PR Ex. H.
[85]82 F. 3d 175, 178-79 (7th Cir. 1996) (affirming the district court's finding that defendant physician was not deliberately indifferent to prisoner's needs where injury was not obvious).
[86]*Id.* at 178-79.
[87]*Id*. at 178.
[88]*Id*.

*Steele* can be distinguished because two sets of hospital staff doctors and the defendant doctor all misdiagnosed the plaintiff's brain hemorrhage.[89] Here, Dr. Bialecke correctly noted the risk of papilledema. The problem in this case is simply the possibility that the report from Dr. Bialecke was ignored or disregarded, which could amount to deliberate indifference due to the serious nature of Faysom's condition.

Despite his position as medical director, Dr. Smith faces the same scrutiny as the other defendant doctors since he too had access to Faysom's medical records in providing medical care to Faysom. Thus, regardless of whether he had any extra duty as medical director or acted appropriately when he first examined Faysom, he had the same potential opportunity to review Dr. Bialecke's report as the rest of Faysom's doctors. The issue is whether the doctors actually saw Dr. Bialecke's report, possessed an actual knowledge of the risk and, possibly, ignored the risk of papilledema. The existence of this report in the medical record now, despite testimony from the doctors that the report was not there when they examined Faysom, creates enough of a question of fact to warrant trial.

**B. Dr. Ghosh**

Faysom's argument that Dr. Ghosh displayed deliberate indifference focuses on the UIC ophthalmologist's recommendation for low vision rehabilitation therapy and Dr. Ghosh's decision not to send Faysom to UIC for this therapy. According to Faysom, a physician can be deliberately indifferent when he elects not to follow the recommendations of a specialist. Faysom cites to two cases in support of this proposition. After reviewing the case law on this subject, the Court finds no

---

[89]*Steele*, 82 F.3d at 178.

genuine issue of material fact as to whether Dr. Ghosh acted with deliberate indifference.

In *Gil v. Reed*, a prisoner suffered from surgical complications that necessitated administering several antibiotics and pain relievers.[90] The surgeon who performed the prisoner's rectal surgery prescribed a regimen of Vicodin and laxatives to reduce the patient's pain during his recovery.[91] The prison physician then chose not to administer Vicodin to the patient, while also taking him off of several of the prescribed laxatives.[92] His condition worsened and he suffered from severe constipation, rectal bleeding and an inability to urinate.[93] The Seventh Circuit reversed a grant of summary judgment holding that the prisoner presented enough facts to create a genuine issue as to the physician's state of mind in refusing to follow the specialist's recommended course of treatment.[94]

The court in *Gil* cited to *Jones v. Simek* in support of its holding that failure to follow an expert's instructions creates a genuine issue of material fact on deliberate indifference.[95] The doctor in *Jones* refused to provide the prisoner with pain medication or order a nerve block operation that was prescribed by a specialist.[96] As a result, the inmate lost the use of one of his arms from the elbow down and was in extreme pain.[97] These facts were also sufficient to survive the defendant's motion for summary judgment.

There are three key differences between this case before the Court and the *Gil* and *Jones* cases. First, the ophthalmologist at UIC could not be considered an expert recommending an exact

---

[90]*Gil v. Reed*, 381 F.3d 649, 653 (7th Cir. 2004).
[91]*Gil*, 381 F.3d at 662.
[92]*Id.*
[93]*Id.*
[94]*Id.* at 663.
[95]*Id.* (citing *Jones v. Simek*, 193 F.3d 485 (7th Cir. 1999)).
[96]*Jones,* 193 F.3d at 488.
[97]*Id.*

course of treatment. He admitted that low vision rehabilitation therapy was not his "area of expertise" and that he would not prescribe the specific therapeutic tasks of the rehabilitation.[98] Additionally, he admitted that he was unaware of what contractual obligations the prison already had or what facilities it had when making the recommendation.[99] Second, Faysom did not offer any evidence that he suffered additional pain or deterioration in his vision as a result of not receiving the therapy recommended by Dr. Close. Faysom's visual field, while poor and defective, remained unchanged. This is distinctly different from the serious pain and permanent injuries suffered by the prisoners in *Gil* and *Jones*. Finally, Dr. Close was not the only ophthalmologist advising Dr. Ghosh. Drs. Bizzell and Ghosh were both aware of Faysom's post-operative condition and monitored his vision at the prison to guard against further deterioration.

Since the UIC ophthalmologist was not an expert in low vision rehabilitation therapy, Dr. Ghosh's actions did not amount to a refusal of a specialist's recommendations but, rather, illustrated conflicting recommendations among similar physicians. This situation is more akin to the *Estelle* case where the Court explained that differences in opinion among medical personnel regarding appropriate treatment do not give rise to deliberate indifference.[100] This, combined with the lack of facts suggesting Faysom suffered any additional pain or injury from this course of action, warrants summary judgment in favor of Dr. Ghosh.

**C. Nurse Timm**

Both Faysom and Timm provide conflicting accounts of Timm's treatment of Faysom in administering his seizure medication. While Timm contends that Faysom often refused to take his

---

[98]Close Dep. 51: 3-6, PSOF Ex. 10.
[99]*Id*. at 51: 14-17
[100]*Estelle*, 429 U.S. at 107.

15

medication, Faysom alleges that Timm deliberately refused to provide him with his prescription seizure medication at times, purposefully throwing the medication at him, or dropping the medication on dirty floors for him to pick up and swallow.[101] Faysom contends that this denial of medication exposed him to an increased risk of seizures. Timm notes that Faysom offered no other evidence other than his personal denial of Timm's testimony. The Court does not, however, have to address whether Faysom or Timm was at fault since deliberate indifference raises the question of whether Faysom suffered any additional pain or harm during the stretches of time when he did not receive his seizure medication.

"Unnecessary and wanton infliction of pain" is prohibited by the Eight Amendment.[102] Since pain is "a uniquely subjective experience, a plaintiff need not produce objective evidence of injury in order to withstand summary judgment."[103] Insisting that subjective, nonverifiable complaints are insufficient to survive summary judgment would place "a whole class of disabled people outside the protection of that law."[104]

Faysom relies solely on *Walker v. Benjamin* in his argument against the motion for summary judgment with respect to Timm.[105] In *Walker*, a nurse refused to administer the prescribed pain medication to the prisoner.[106] The prisoner could only offer his own personal account of the events and the pain he suffered, and this version of the facts was enough to create an issue for the jury of whether he was in pain, or simply malingering for medication.[107] In contrast, Timm cites to two

---

[101] Faysom Dep. 187: 4-12, PSOF Ex. 2.
[102] *Estelle*, 429 U.S. at 104.
[103] *Walker v. Benjamin*, 293 F.3d 1030, 1040 (7th Cir. 2002) (citing *Cooper v. Casey*, 97 F.3d 914, 917 (7th Cir. 1996)).
[104] *Cooper*, 97 F.3d at 917.
[105] 293 F.3d at 1040.
[106] *Id*.
[107] *Id*.

16

Seventh Circuit decisions holding that when pain is not at issue, a prisoner's "own uncorroborated testimony is insufficient to defeat a motion for summary judgment."[108]

*Walker* is distinguishable from Timm's treatment of Faysom since the medication in *Walker* treated pain and not seizures. Faysom did not contend that he was in any additional pain or that he even suffered any seizures as a result of missing doses of his seizure medication, only that he was at an increased risk of suffering a seizure. He also did not cite to medical records that reported additional pain or injuries due to seizures or his lack of seizure medication. Since Faysom's pleadings with respect to Timm focus on the withholding of medication, and not any resulting pain or injuries, his uncorroborated testimony is insufficient to defeat the motion for summary judgment as it applies to Timm.

While the Court acknowledges that Timm may not have provided the best care, or even appropriate care, to Faysom after his operations, the issue for a deliberate indifference claim is whether a link was made between her withholding of his seizure medication and any subsequent pain or injury.[109] Faysom established no such link and, thus, the Court grants summary judgment in favor of Timm.

---

[108] *See Weeks v. Samsung Heavy Industries Co., Ltd.*, 126 F.3d 926, 939 (7th Cir. 1997) (citing *Cowan v. Glenbrook Security Services, Inc.*, 123 F.3d 438, 446 (7th Cir. 1997)).

[109] *Walker*, 293 F.3d at 1040 (holding that nurse and physician's treatment decisions and the patient's complaints of pain created an issue for a jury to hear).

## IV. CONCLUSION

For the foregoing reasons the Court grants the motion as to defendants Dr. Ghosh and Timm and denies the motion as to defendants Drs. Aguinaldo, Tilden and Smith [dkt 215]. The matter is set for further status on January 14, 2009 at 9:30 a.m.

**IT IS SO ORDERED.**

**ENTERED:** December 8, 2008  _____

UNITED STATES MAGISTRATE JUDGE
Susan E. Cox